**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X

ANDREY ALISHAYEV,

                                               Case No.: 1:25-cv-2075-MMG

                         **Plaintiff,**

      -against-

JUDGMENT RECOVERY PARTNERS LLC,
TYLER UMANS, and
JAMES W. OLSEN,

                           **Defendants.**
-------------------------------------------------------------------X

### FIRST-AMENDED COMPLAINT AND JURY DEMAND

Plaintiff Andrey Alishayev brings this action against Defendants Judgment Recovery Partners LLC ("JRP"), a California judgment recovery company, Tyler Umans, a principle at JRP, and James W. Olsen, a Colorado attorney licensed in New York, for violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* for conversion related to the unlawfully restraining, seizing, and retaining Mr. Alishayev's exempt Social Security Disability Income, and for gross negligence, and in support alleges as follows.

### SUMMARY OF CLAIMS[1]

Fourteen years ago a debt collector sued Mr. Alishayev sued in civil court, filed a false affidavit of service, and got a default judgment. Mr. Alishayev is disabled. He lives solely off of his $1,679.00 a month Social Security Disability. He knew nothing of the judgment until on or about April 1, 2024 when he learned that he could not access $8,997.90 from his Chase bank account, about 1/3rd of his life's savings. Frantic he went to his local Chase branch. The bank told him they could not provide him any information other than the phone number for the marshal to call and four pages of documents, the most important being an Exemption Claim

---

1 This summary is for the convenience of the Parties and the Court. The summary is not intended to limit the basis of Plaintiff's claims as the full factual basis for the claims is laid out in far greater detail in the statement of facts.

Form ("ECF"). When Mr. Alishayev called the marshal they gave him the number of Judgment Recovery Partners LLC (JRP). Mr. Alishayev told JRP they were restraining his bank account that contained solely Social Security Disability Income ("SSDI"). JRP asked Mr. Alishayev to email bank statements showing the Social Security deposits. Mr. Alishayev did so immediately. The statements showed the direct deposits from the Social Security Administration ("SSA"). On or about April 6, 2024 Mr. Alishayev also faxed the marshal the bank statements, an executed ECF, and a letter from the SSA documenting that he had been receiving SSDI since August 21, 2021 and the amount of his monthly payments. The documents in the April 6 fax demonstrate, as a matter of arithmetic and of law, that all of the money in the account was from SSDI, and thus could not be lawfully restrained. The marshal emailed the documents from the April 6 fax the JRP, specifically Tyler Umans as principle at JRP.  JRP should have then immediately released the money. It did not. JRP asked for additional bank statements from Mr. Alishayev who promptly emailed the statements which, again, showed only SSA direct deposits. JRP said it would have its "upper management" review. In a follow up call JRP said (incorrectly) Mr. Alishayev that it was his responsibility to hire a forensic accountant to show all the money was exempt. Chase bank then removed the $8,997.90 from Mr. Alishayev and issued the marshal a check for that amount. The marshal then emailed JRP, Tyler Umans specifically, and asked what they wanted him to do with the money since they received the ECF and supporting documents. Should they return the money to Mr. Alishayev, the marshal asked? Mr. Umans, who had all of the documents from the April 6 fax conclusively showing all the money was exempt, said to send the money to JRP. The marshal promptly issued the check and mailed it to JRP in California.

For 5 ½ months from when he learned his account had been restrained, Mr. Alishayev went through frenzied attempts to get the money back by calls, emails, and faxes with JRP, a

flurry of *pro se* motions and court hearings, and a complaint with the New York Attorney General until, after the Attorney General's involvement, JRP finally returned his money.

JRP is neither the judgment assignee nor a law firm, but takes the role of both in controlling the entire execution process. JRP generates from it California office an Execution with the name and apparently digital signature, James W. Olsen, an attorney who resides in Colorado but has New York law license. The address for the Olsen firm is listed in NYC, the same address listed by JRP as an address for itself, but which is in fact just a UPS store with a mail forwarding service. All of the interactions with the marshal are from JRP in California. Mr. Olsen in fact has no involvement with the Executions, which can only be issued by a licensed NY attorney. In fact, all of the communications with the marshal are from JRP in California. Essentially, JRP is engaging in the unauthorized practice of law and Mr. Olsen is allowing JRP to use his license. River Heights Capital, LLC is a judgment purchaser and putative judgment assignee, and is vicariously liable for the actions of the other defendants who are acting is its agents in the course and scope of their agency.

Defendants inflicted substantial damage on Mr. Alishayev, who is disabled and obviously particularly vulnerable. He could not sleep for those 5 ½ months, tossing, turning, and fixating on how he could get his money back and what would happen to him if he could not. He would not false  He would not be able to fall asleep until 2:00 or 3:00 AM and was up by 4:00 or 5:00 AM.  He was of course then exhausted during the day. This was all he could think about when he was trying to go to sleep. He was haunted. He lived in fear that he would not be able to pay his rent, be evicted, and again be homeless. This was no small fear: in the past he had been homeless for three years. He lost all appetite. Sometimes he would go an entire day without eating anything. He lost **thirty pounds** over all these months because of the stress and inability to eat.

He felt scared, isolated, powerless, and alone. Mr. Alishayev now files suit to hold Defendants accountable for their actions.

## A.       JURISDICTION AND VENUE

1.       The Court has federal question jurisdiction over the lawsuit because the action arises under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*, ("FDCPA"). Jurisdiction of the Court arises under 28 U.S.C. § 1331 because this dispute involves predominant issues of federal law, the FDCPA. Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202. The Court has supplemental jurisdiction under 28 U.S.C. §1367 over Plaintiff's state law claims because said claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

2.       Venue in this District is proper because all or a substantial part of the events or omissions giving rise to their claims occurred in Bronx County, New York.

## B.       PARTIES

3.       Plaintiff Andrey Alishayev is an individual residing in Bronx County, New York.

4.       Defendant Judgment Recovery Partners LLC ("JRP") is a limited liability company organized and existing under the laws of the State of Wyoming. The Wyoming Secretary of State lists its principal place of business at 5737 Kanan Rd., Ste. 655, Agoura Hills, CA 91301. However, that address is simply a mail drop.[2]

5.       The California Secretary of State lists JRP's principal address as 26901 Agoura Rd., Ste. 155, Calabasas, CA 91302. This was the same address JRP listed as its "executive office address" in response to an inquiry from the New York Attorney General's office, as further described below.

---

2 Using Google Maps, one can see that 5735 Kanan Rd. is a storefront for a business called "Postal Annex," which offers various shipping and mailing services similar to those offered by The UPS Store and FedEx Office. Postal Annex is in the business of renting mailboxes to individuals and businesses. Thus, it seems unlikely that 5735 Kanan Rd. is actually JRP's "place of business," whether principal or otherwise.

6.      On its website, JRP identifies itself as "Collecting Judgments Across New York State," and urges the viewer to "Submit Your Judgment for Collection." The website continues:

> How do we collect the judgment?  By using in depth skip tracing tools, asset locating techniques and legal procedures we: Find their bank account, freeze it and remove the funds . . . Find their employer, garnish their wages . . . Find their property, seize and auction it."

**Exhibit A** (JRP Website, https://judgmentrecoverypartners.com/ ).[3]

7.      On information and belief, JRP makes good on these claims by regularly causing to be issued and sent hundreds of income executions, bank restraints, information subpoenas, and, as in the case at bar, bank executions.  The collection of consumer debts is the principal purpose of JRP. JRP is licensed as a debt collector with the New York City Department of Consumer and Worker Protection. JRP is therefore a "debt collector" as defined in 15 U.S.C. § 1692a(6).

8.      Defendant Tyler Umans is an individual residing in California and a Manager of JRP. His regular place of business is 26901 Agoura Rd., Suite 155, Agoura Hills, CA 91301. He is licensed to practice law in the state of California but not in the state of New York.

9.      As explained further below, Mr. Umans was actively engaged in the collection of the default judgement against Mr. Alishayev.  Based on this fact, and on information and belief, Mr. Umans, as Manager of JRP, is engaged in the collection hundreds if not thousands of consumer judgments. Mr. Umans is therefore a "debt collector" as defined in 15 U.S.C. § 1692a(6).

10.     Defendant James Olsen is an individual residing in Colorado. According to the New York Bar website, as well as his own website, www.jamesolsenlaw.com, his regular place of business is 2205 W 136th Ave., Suite 106, Broomfield, CO 80023. He is licensed to practice law in the State of New York.

11.     As explained more fully below, Mr. Olsen played an integral role in the scheme to collect on the consumer debt alleged to be owed by Mr. Alishayev, by allowing JRP to use his digital

---

3 All referenced Exhibits are incorporated by reference in their entirety to this Complaint.

signature on post-judgment enforcement devices such as information subpoenas, banks restraints and, here, Executions With Notice to Garnishee. On information and belief, Mr. Olsen has played the same role in enabling JRP to collect on dozens or hundreds of consumer debts alleged to be owed by consumers in New York. Mr. Olsen is therefore a "debt collector" as defined in 15 U.S.C. § 1692a(6).

12.    The California Secretary of State, however, lists RHC's principal address as 26901 Agoura Rd., Ste. 155, Calabasas, CA 91301 – the same address it lists for JRP.

13.    The New York City Department of Consumer and Worker Protection also lists 26901 Agoura Rd., Ste. 155 as RHC's address.

14.    According to a "Assignment of Judgment" filed in the lawsuit Harvest Credit Management VII, LLC v. Alishayev, Index. No. CV-013274-11/QU, RHC claimed it was the ultimate assignee of the judgment in that case at all times relevant to the events described in this Complaint. **Exhibit B** (Assignment of Judgment).   Plaintiff was never sent the Notice of Assignment; he only obtained the document by requesting the Court file after seeking to file an Order to Show Cause.

15.    JRP was never the putative assignee of the default judgment against Mr. Alishayev and had no right restrain or seize Plaintiff's bank account. The JRP website states engages in judgment collections with "NO Assignment of Judgment." **Exhibit A** (JRP Website).

16.    On its website, RHC claims to be a debt buyer, certified by a private trade group called Receivables Management Association International, "that specializes solely in the purchase of judgments," and further claims that it has "been able to development a cost-effective and fully compliant system that achieves optimal liquidation." **Exhibit C** (RHC Website, www.riverheightscapital.com ).

17.    In other words, the principal purpose of RHC's business is to buy consumer debts, originally owed to another, after such debts have already been reduced to judgment. RHC then collects on those judgments retaining the services of JRP to garnish consumer's bank accounts and wages and through other execution devices as described above. RHC is also licensed as a debt collector with the New York City Department of Consumer and Worker Protection. RHC is therefore a "debt collector" as defined in 15 U.S.C. § 1692a(6).

18.    On information and belief, JRP was acting as RHC's agent at all times relevant to the events described in this Complaint. RHC is therefore vicariously liable for all of JRP's acts and omissions as described below.

## C.    STATEMENT OF FACTS

19.    Plaintiff Andrey Alishayev is 41 years old and resides in the Bronx. Mr.  Alishayev is disabled. Since approximately 2021 his sole source of income has been Social Security Disability ("SSDI").  He received $1,679.00 per month in 2024 direct deposited into his bank account from the Social Security Administration. The deposits are reflected on his bank statements as from "SSA Treas."

### Background: The Default Judgment

20.    On or around February 9, 2011, debt buyer Harvest Credit Management VII, LLC ("Harvest"), through its attorneys, filed a summons and complaint against Mr. Alishayev, Index. No. CV-013274-11/QU. **Exhibit D** (Collection Lawsuit).

21.    The 2015 Collection Lawsuit alleged that Andrey Alishayev (misspelled in the caption of the complaint as "Andrew Alishayeva") entered into a consumer credit agreement with HSBC/GM, defaulted on the agreement, and owed a balance of $6,263.09, and that Harvest had purchased the debt from HSBC/GM. *Id.*

22.    The Affidavit of Service asserted that Mr. Alishayev's "usual place of abode" was 9837 65th Ave. Apt. 1C, Rego Park, NY 11374-3432 and that a copy of the summons and complaint was left with a person of suitable age and discretion phantom-person named Luba Alishayeva on April 2, 2011. **Exhibit E** (Affidavit of Service). The affidavit further asserted that service was completed by mailing a duplicate copy of the summons and complaint to the same address on April 4, 2011 – so-called "substitute service" pursuant to CPLR § 308(2).

23.    However, however, while Mr. Alishayev did live at that address in April 2011, because no one named "Luba" lived there with him, the Affidavit of Service is fraudulent. In any case, Mr. Alishayev had no knowledge of the Collection Lawsuit until approximately 13 years later when his bank account was frozen. Because of this, he never filed an answer in the Lawsuit.

24.    On June 3, 2011, Harvest's attorneys used false the Affidavit of Service to apply for a default judgment against Mr. Alishayev in the amount of $6,753.72. The default judgment was entered on June 13, 2011. **Exhibit F** (Default Judgment).

### JRP Restrains Plaintiff's Bank Account and Then Seizes the Funds After Receiving Documents Demonstrating, As a Matter of Law, That All of the Funds Were Exempt Social Security

25.    Approximately 13 years later, on March 12, 2024, the Office of City Marshal Ronald Moses ("the Marshal's Office") received an "Execution With Notice to Garnishee" (the "Execution") bearing the caption of the Lawsuit. **Exhibit G** (Marshal Account Notes, p. 3, line 1); and **Exhibit H** (Execution).

26.    The Execution bears the purported signature of attorney James W. Olsen of the Law Offices of James Olsen, Esq. with an address of 82 Nassau St., Suite 9002, New York, NY 10038.

27.    In response, the Marshal's Office generated a Levy and Final Demand dated March 12,

2024 (the "Levy") and addressed to "JP Morgan Chase Bank Court Orders & Levies" at an address in Monroe, Louisiana. The Levy made demand Chase to turn over all property in its possession belonging to Mr. Alishayev, up to $8,997.90. **Exhibit I** (Levy).

28.     The Marshal's Office indicates it delivered to Chase a package of documents consisting of 1) the Levy, 2) the Execution, 3) a one page document entitled "Exemption Notice," and 4) two copies of an Exemption Claim Form (collectively "the Package," **Exhibit J)** The Marshal's Office did not send the Package to Mr. Alishayev.

29.     Notably, the ECF identifies JRP as the "Creditor or Attorney" when JRP was neither. (**Exhibit K** "ECF")

30.     Chase sent the Marshal's Office a letter dated March 25, 2024, acknowledging receipt of the Levy and stating that it was holding $8,997.90 – the entire amount demanded – of Mr. Alishayev's funds in compliance with the Levy and Final Demand. **Exhibit L** ("Chase Response.")

31.     On information and belief, Chase began to process the Levy on or about March 20, 2024. When Chase begins to process a bank restraint or levy it internally generates an identification named "COAL" with a series of codes, including for the date it begins to process the restraint or levy. The Chase Response lists a COAL number including "20Mar24," and abbreviation for March 20, 2024.

32.     On or about March 25, 2024 Chase removed $100 from Mr. Alishayev's bank account for a Legal Processing Fee.

33.     On or about April 1, 2024 Mr. Alishayev used the Chase app on his mobile device to check his account balance, and discovered his available balance was significantly lower than expected. Specifically, $8,997.90 of the money in his account was not available to him.

34.    On or about April 2, 2024, Mr. Alishayev physically went to the Chase branch at 3775 Riverdale Ave. in the Bronx to find out more about why his bank account was frozen and to get all documents regarding the freeze. There, a Chase employee gave Mr. Alishayev the documents the Marshal's Office previously sent the bank, **Exhibit** J (the Package), which included two copies of a blank Exemption Claim Form. **Exhibit K** (ECF).

35.    This visit to the Chase branch was the first and only time Chase (or anyone else) provided Mr. Alishayev an ECF. Mr. Alishayev never received the ECF from Chase via mail, email, or by any other means. The Package the Chase employee gave to Mr. Alishayev on or about April 2, 2024 were the only documents Chase has ever provided to him related to the restraint of his account and the seizure of his funds.

36.    The Chase employee also gave Mr. Alishayev the name and number of the Marshal's office and told him to call that office for more information. That same day Mr. Alishayev called the Marshal's Office and told them the sole source of money in the Chase bank account was Social Security Disability Income. The Marshal's Office gave Mr. Alishayev JRP's telephone number to call.

37.    Later that day, on April 2, 2024, Mr. Alishayev telephoned JRP using the phone number given to him by the Marshal's Office. The call went directly to voicemail; Mr. Alishayev left a voicemail explaining who he was and requesting a call back.

38.    On or about April 4, 2024 Mr. Alishayev executed the ECF stating, subject to the penalty of perjury, that his Chase bank account contained Social Security Disability funds.

39.    On April 3, 2024 the Marshal's Office mailed to JRP in California a notice that Chase was scheduled to pay out $8,997.90 on May, 23.  **Exhibit  M** (April 3 Payout Notice)

40.    On or about April 4, 2024, Mr. Alishayev received a call back from a JRP employee who

identified himself as Charles Brown.

41.    Mr. Alishayev explained to Mr. Brown that the bank account they froze contained exclusively Social Security Disability Income (SSDI).  Mr. Brown asked that Mr. Alishayev email send him bank statements showing the SSDI deposits. Mr. Brown refused to provide Mr. Alishayev a fax number to fax the documents.

42.    On April 4, 2024 Mr. Alishayev emailed the two most recent bank statements and in the text of the email pleaded with Mr. Brown to release the money. **Exhibit N** (April 4 Email to JRP).

43.    In the attached statements, the Social Security deposits are clearly noted the direct deposits from the Social Security Administration, specifically, "SSA Treas." There were no other deposits into the account.

44.    Even though Mr. Brown refused to give Mr. Alishayev a fax number for JRP, Mr. Alishayev was able to find it by searching the Internet.

45.    On Saturday, April 6, 2024, Mr. Alishayev faxed the following materials both to the Marshal's Office and to JRP directly: a) a completed and executed ECF, stating, subject to the penalty of perjury, that his Chase bank account contained Social Security Disability funds; b) a March 26, 2024 Social Security Administration Benefit Verification Letter verifying that Mr. Alishayev received such benefits ("SSA Letter"); and c) Chase bank account statements from December 26, 2023 to March 25, 2024 showing that he had received direct deposit SSD payments, and deposits from no other source. **Exhibit O** (April 6 Fax).[4]

46.    The April 6 Fax demonstrated, as a matter of law, that ***all*** of the money in the account was exempt Social Security payments. The fax attached bank statements from December 26, 2023 to March 26, 2024 documenting that the only deposits were two direct deposits labeled as

---

4 The Marshal's Office stamped the fax sent on Saturday March 6 as received on Monday April 8.

being from Social Security ("SSA Treas") of $1,679.00 each, and an ending balance of $24,908.94 on or about the date of the restraint. Critically, SSA Letter included in the April 6 Fax stated that Mr. Alishayev was disabled since August 21, 2011, which would demonstrate SSD payments far in excess of the balance of the account on the date of the restraint. The SSA Letter specifically stated the benefits were $1,631.00 from December 2022 to November 2023 and $1,679.00 since December 2023. Regardless if only non-exempt funds of any amount were in the account as of December 2022, or were put into the account after December 2022, as a matter of law, all of the $24,908.94 in the account was exempt from restraint under the "lowest intermediary" accounting rule that applies to bank accounts that receive exempt funds.[5]

47.    Defendants are liable under the FDCPA if they restrained (much less seized) funds they even had reason to believe contained exempt funds. *Arias v. Gutman, Mintz, Baker & Sonnenfeldt LLP*, 875 F.3d 128, 136–39 (2d Cir. 2017)

48.    On Monday, April 8, 2024, the Marshal's Office emailed the April 6 fax to Tyler Umans. The body of the email read: "Good Afternoon, Please find attached Exemption Claim Form with supporting documents as attached which we received from the Consumer, for your perusal and await your further advices, in respect of the above subject matter." **Exhibit P** (April 8 Email).

49.    A Marshal's Office employee entered a note about the email to Tyler Umans into the electronic file on Mr. Alishayev's account. The note read: "EMAILED DOCS TO TYLER/ATY," even though he actually was not an attorney. **Exhibit F** (Marshal Account Notes).

---

5 See *Arias v. Gutman, Mintz, Baker & Sonnenfeldt LLP*, 875 F.3d 128, 132 n. 2 (2d Cir. 2017) ("Under the lowest intermediate balance principle, exempt funds are the last funds to leave the account. For example, if $1,000 of exempt funds and $1,000 of non-exempt funds are deposited, and then $1,000 is withdrawn, the remaining $1,000 is exempt.")  As to Mr. Alishayev, the SSA Letter demonstrates, as a matter of arithmetic, that from December 2022 to March 2024, $26,288 of exempt SDDI accrued ($1,631 x 12 = $19,572 and 4 x $1,679 = $6,717). This exceeds the $24,908.94 balance in the account on March 25, 2024 when the account was restrained, as reflected on the last entry of the final Chase bank statement.

50.     On April 12, 2024 Mr. Alishayev called the Marshal's Office to know if his bank account would be released, but was referred to call JRP. **Exhibit F** (Marshal Account Notes).

51.     On or about April 12, 2024, Mr. Alishayev called JRP to ask if it had received the ECF and supporting documents that he had faxed. Mr. Brown told Mr. Alishayev that JRP required bank account statements in order to support the claim that all of the funds in the Chase bank account were exempt.

52.     This of course is false as JRP already had received from the April 8 Email from the Marshal's Office documentary evidence sufficient to demonstrate all of the money in the account was exempt. And on April 1 Mr. Alishayev had already emails documenting the SSA direct deposits which, again, were the only deposits reflected in the statements. **Exhibit N** (April 4 Email to JRP).

53.     Desperate to have JRP to release his money, on April 12, 2024 Mr. Alishayev sent a series of emails to Mr. Brown bank account statements for the period of September 26, 2023 – March 26, 2024. Yet again, the additional statements documented the SSA direct deposits, and that there were no other deposits.

54.     On April 15, 2024, Mr. Brown responded to that email, writing: "Thank you Mr. Alishayev, these have been sent/ forwarded to upper management to review."

55.     On April 16, 2024 Mr. Alishayev called the Marshall's Office asking when his bank account would be released, but was again referred to call JRP.

56.     On or about April 16, 2024, Mr. Alishayev again called JRP and asked Mr. Brown when, given the months' worth of bank statements showing that his sole source of income was Social Security Disability, JRP would give instructions for the restraint to be released. In response, Mr. Brown said that JRP would *not* be releasing the restraint on Mr. Alishayev's money, and that if

that was Mr. Alishayev's goal, the burden was on him to "hire a forensic accountant" in order to prove that Social Security Disability was the source of all the funds in the Chase bank account.

57.     On April 23, 2024, Chase removed from Mr. Alishayev's account the $8,997.90 that it had been restraining, and mailed a check in that amount to the Marshal's Office. **Exhibit Q** (Statement with Levy).

58.     On May 1, 2024, the Marshal's Office received the $8,997.90 check from Chase.

59.     That same day, a Marshal's Office employee emailed Tyler Umans. The email read: "Good morning Tyler, . . . Please be advised that we received full levy amount $8007.90 today from JPMC. . . . Should we keep $$ or return to the Consumer due to ECF? [Exemption Claim Form]" **Exhibit R** (May 1 Email from Marshal to Umans and May 1 Response).

60.     As before, the Marshal's Office employee entered a note about the email into the electronic file on Mr. Alishayev's account. And as before, the note referred to Mr. Umans as "TYLER/ATY". **Exhibit G** (Marshal Account Notes).

61.     Later in the day on May 1, 2024, Mr. Umans responded to the email, writing, "Please remit funds to our office on this case." **Exhibit R** (May 1 Email from Marshal to Umans and May 1 Response). Again, this payout demand was after Mr. Umans received the April 6 Fax documenting that, as a matter of law, all of the funds he asked to be remitted to his office was exempt SSD, as well as receiving bank statements on April 4 and 15.

62.     The Marshal's Office then remitted the funds it had received from Chase to JRP, minus fees, expenses, and poundage, by mailing a check to JRP in California

63.     Upon receipt of Mr. Umans's email, a Marshal's Office employee noted it in the electronic file on Mr. Alishayev's account. Once again, Mr. Umans was referred to as "TYLER/ATY." **Exhibit G** (Marshal Account Notes).

64.    A Satisfaction of Judgment in the Lawsuit was filed on May 2, 2024. **Exhibit Q** (Satisfaction of Judgment).

### Mr. Alishayev, *Pro Se*, Desperately Seeks Intervention By the Attorney General and The Courts to Get His Exempt Money Returned

65.    On May 1, 2024, trying every way he could think of to get his disability benefits back, Mr. Alishayev filed a complaint concerning JRP and its illegal garnishment of his exempt funds with the New York Attorney General's Office. **Exhibit T** (AG Complaint).

66.    From May 20, 2024 through October 17, 2024, Mr. Alishayev, *pro se,* desperately sought to navigate the Civil Court system to obtain the return of his SSDI by filing a series of Orders to Show Cause requiring multiple appearances. Ultimately those five months of *pro se* efforts failed to get an order to return the money.

67.    On June 3, 2024, the Marshal's Office received the copy of the First OSC in the mail and forwarded a copy to JRP. **Exhibit G** (Marshal Account Notes, p. 4, line 44). Despite being put on notice once again of the exempt status of the funds it had taken from Mr. Alishayev's bank account, JRP continued to refuse to return the money or to respond in any way to the First OSC.

68.    Ultimately, however, Mr. Alishayev's months of *pro se* efforts attempts to obtain relief proved frustrating and fruitless.

69.    However, Mr. Alishayev's parallel attempts to obtain the assistant of the NY Attorney General, would, after months, would finally succeed.

70.    The Attorney General's Office sent letters to JRP on August 20, 2024 and September 3, 2024 concerning Mr. Alishayev's complaint.

71.    On October 11, 2024, JRP responded to Mr. Alishayev's complaint, writing in a letter to the Attorney General's Office saying that it would return the funds it had garnished. **Exhibit U** (JRP Response to AG).

72.    Mr. Alishayev, however, still did not know that JRP had responded to the Attorney General's Office.

73.    Mr. Alishayev finally received a refund of the funds JRP had illegally garnished on or about October 24, 2024.

**<u>Defendants' Inflicted Monetary and Substantial Emotional Distress Damages</u>**

74.    In addition to depriving Mr. Alishayev of the use of nearly $9,000 worth of his own money for 213 days, Defendants' acts caused him considerable emotional and mental distress.

75.    While losing $9,000 may not seem like much money to other people, for Mr. Alishayev that is more than 5 ½ months of income. It is more than 1/3rd of all his remaining cash life savings.  Having that money wrongfully restrained and seized for 213 days, and his constant overwhelming efforts to get the money back inflicted substantial emotional distress damages on the disabled Mr. Alishayev.

76.    When he learned that $9,000 worth of his Social Security Disability benefits had been taken from him in violation of his rights, Mr. Alishayev felt anxious and powerless to the point of feeling physically ill. His muscles felt sore, his heart was racing, and his breathing was heavier than usual.

77.    Mr. Alishayev could not sleep for the 5 ½ months he was without his money and during his frenzied attempts to get his money back. He would not be able to fall asleep until 2:00 or 3:00 AM and was up by 4:00 or 5:00 AM.  He was of course then exhausted during the day.

78.    This was all he could think about when he was trying to go to sleep. He was haunted. He lived in fear that he would not be able to pay his rent, be evicted, and again be homeless. This was no small fear: in the past he had been homeless for three years.

79.    He lost all appetite. Sometimes he would go an entire day without eating anything. He

lost *thirty pounds* over all these months because of the stress and inability to eat.

80.    He felt isolated and withdrawn. He felt angrier and more hostile.

81.    Before Defendants illegally took his money, he used to enjoy spending time with his nephews and nieces at the park or playing games, but he could no longer motivate himself to do that during this ordeal.

82.    This is not anything a disabled man should be put through.

### **JRP's Sham Use of Attorney Signature to Engage in the Unauthorized Practice of Law in New York**

83.    As previously noted, on or about March 12, 2024, the Marshal's Office the Execution mailed from JRP in California with a digital purported signature of attorney James Olsen and listing an office for him in New York City.  **Exhibit G** (Marshal Account Notes, p. 3, line 1); and **Exhibit H** (Execution).

84.    However, the Marshal's Office indicates that the Execution was actually mailed from California by JRP.

85.    JRP, on its website, lists 82 Nassau St., Suite 9002, New York, NY 10038 as its own address. **Exhibit A** (JRP Website).

86.    In fact, there is neither a law office nor a debt collection agency located at 82 Nassau Street. There is only one business with an 82 Nassau Street address, and it is a UPS Store.

87.    The UPS Store advertises itself as, among other things, "The Mailbox Store." Signage inside the 82 Nassau Street location proclaims that it offers mailbox rental services, including "Package Receiving, Real Street Address, Call-in Mail Check, 24-Hour Access, and Mobile Notifications."

88.    The physical mail boxes inside the 82 Nassau Street location are numbered 101 to 698. The fact that there is no "9002" suggests that the UPS Store forwards all the mail sent to that

suite number to some other location, which in itself suggests that whoever rented that suite address is not located close to 82 Nassau Street and therefore has no need for a physical mailbox.

89.     Moreover, the signature purporting to be that of James Olsen appears to be a digital image of a signature superimposed upon the signature block, as opposed to an original signature. **Exhibit E** (Execution).

90.     The electronically stored notes that the Marshal's Office maintained on Mr. Alishayev's account state that the "Attorney" on the account is "Judgment Recovery Partners." **Exhibit G** (Marshal Account Notes).

91.     The Marshal's Office received the Execution is mailed directly from JRP, from a location in California – and not from the Law Offices of James Olsen, Esq. in either Colorado or New York.

92.     More specifically, for all executions with the office of Marshal Moses purporting to be signed by attorney James Olsen, the email communications are with JRP, either to JRP Legal legal@judgmentrecoverypartners.com    or    a    specific    person    with    the judgmentrecoverypartners.com root email, and not with Mr. Olsen.

93.     All of the mailed correspondence from the office of Marshal Moses regarding Plaintiff were mailed to "JUDGMENT RECOVERY PARTNERS, SUITE 655, 5737 KANAN ROAD, AGOURA HILLS CA 91301.

94.     Mr. Olsen's New York attorney registration information as well as his own website indicate that the name of his law office is James Olsen Law, and that its address is located in Broomfield, CO. Moreover, 82 Nassau St., Suite 9002 is listed as the headquarters for JRP on its website.

95.     Moreover, throughout the Marshal's Office's notes on Mr. Alishayev's account, there are

frequent references either to "ATTY" or to "TYLER/ATY". But none of these refer to Mr. Olsen or to The Law Offices of James Olsen, Esq. Rather, they refer exclusively either to JRP, a limited liability company which is not a law firm, or to Tyler Umans, a manager of JRP who is not licensed to practice law in the state of New York.

96.    The above facts strongly suggest that Mr. Olsen has merely loaned his name to JRP for use in signing New York state legal papers such as Executions that require the signature of a licensed attorney.

97.    On information and belief, Mr. Olsen has willingly agreed to let JRP sign his name to New York state legal pleadings.

98.    On information and belief, Mr. Umans and others who are not licensed to practice law in the courts of the state of New York are engaging in unauthorized practice of law by signing Mr. Olsen's name to Executions and other legal pleadings.

### D.    COUNT 1: FAIR DEBT COLLECTION PRACTICES ACT

99.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

100.    For the reasons stated in the "Parties" section of this Complaint, JPR, Umans, and Olsen are debt collectors within the meaning of 15 U.S.C. § 1692a(6).

101.    The obligation alleged to be owed by plaintiff is a "debt" as defined by 15 U.S.C. § 1692a(5) because the putative debt was incurred primarily for family, personal or household purposes. The Summons & Complaint in the Collection Lawsuit alleged the obligation arose from a consumer credit transaction.

102.    Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3) because Plaintiff was alleged to owe a "debt."

103.    Defendants violated the following sections of the FDCPA: 15 U.S.C. §§ 1692e and 1692f. By way of example and not limitation, Defendants materially violated the FDCPA by taking the following actions in an attempt to collect a debt or in connection with an attempt to collect a debt: using false, deceptive or misleading representations or means; making false representations of the character, amount, or legal status of any debt; making false representations of any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt; making a false representation or implication that any individual is an attorney or that any communication  is from an attorney;  threatening to take and actually taking an action prohibited by law; representing or implying that the nonpayment of any debt will result in the seizure, garnishment, attachment, or sale of any property unless such action is lawful;  the failure to make the disclosures required by 1692e(11); using any false representation or deceptive means; and using unfair or unconscionable means.

104.    The injuries inflicted on Plaintiff by Defendants are concrete and particular, and these injuries have a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.

105.    Plaintiff suffered economic injuries that historically have provided a basis for lawsuits in American courts, including but not limited to theft of funds contained in his bank account; out of pocket expenses for postage and for travel to and from court; lost time spent going to the courthouse, to appear on his OSC to return funds that were exempt from execution, and to gather evidence for the OSCs, among other related expenses.

106.    Plaintiff's injuries are analogous to, *inter alia*, the following common law claims: conversion, trespass to chattels, defamation, negligence, gross negligence, invasion of privacy, intrusion upon seclusion, malicious civil prosecution, and abuse of process.

107.    Defendants had a duty to exercise reasonable care in the collection of debts, including in the selection of personnel to attempt to collect the debt, in ensuring that property exempt from execution is not restrained or garnished, and in furnishing agents with accurate information when those agents rely on and use that information in attempting to collect debts.

### E.    COUNT 2: Conversion

108.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

109.    The elements of conversion in New York State include: 1) having a possessory interest in property; and 2) having the possessory interest taken or interfered with by another in a manner that is contrary to the possessor's rights.

110.    Property subject to conversion includes funds contained in bank accounts.

111.    Defendants intentionally and without authority, assumed and exercised control over Plaintiff's bank account funds despite receiving an ECF from Plaintiff, and despite knowing that the funds were exempt from execution, interfering with his right to possession of the same

112.    Further, JRP was not the judgment assignee and had no right at any point to seek to restrain or seize Plaintiff's bank account. In addition, no Defendant had a right to seek to collect the default judgment because Plaintiff never received, and on information and belief was not sent, a notice of assignment of the default judgment.

113.    In other words, Defendants never had a legitimate basis or authority to restrain then seize Plaintiff's bank account, and thus the bank account garnishment from its onset constituted conversion.

114.    Defendants' improper seizure of and failure to return Plaintiff's money, which harmfully interfered with Plaintiff's rights to control his own property, constitutes conversion.

115.    For the reasons stated in the statement of facts, Defendants' conduct was gross, wanton or deliberate and demonstrates a high degree of moral culpability. The conduct demonstrates malice, insult, and/or willful or reckless disregard of Plaintiff's rights, or other aggravated acts. Defendants' conduct evidences a high degree of moral culpability, or is so flagrant as to transcend mere carelessness, or constitutes willful or wanton negligence or recklessness to justify a punitive damage award.

116.    For these reasons, Plaintiff is entitled to punitive damages, in addition to actual damages. Actual damages include, *inter alia*, the loss of use of money for the period Defendants wrongfully exercised dominion and control over Plaintiff's funds, and consequential damages resulting therefrom. Plaintiff suffered serious mental distress and disruption of his daily life.

### THIRD COUNT
### Gross Negligence (as to all Defendants)

117.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

118.    Defendants had statutory and common law duties, violated those duties, and as such committed negligence *per se*. Plaintiff is not bringing a claim of mere negligence, but uses the negligence per se violation as a violation of a predicate duty upon which his gross negligence claims are based.

119.    Defendants' failure to exercise even slight care or diligence amounts to gross negligence.

120.    Moreover, had Defendants exercised even slight diligence they would have known their conduct was unlawful.

121.    Defendants' actions evince a reckless disregard for the rights of Plaintiff and others. The

actions have the appearance of intentional wrongdoing. Defendants' conduct was part of a broader pattern of misconduct aimed at the public in general.

122.    To the degree Plaintiff's claim of gross negligence is inconsistent with the other claims in this action, the gross negligence claims are brought in the alternative.

## F.    JURY DEMAND.

123.    Plaintiff demands a trial by jury.

## G.    PRAYER

WHEREFORE, Plaintiff requests the following relief:

   a.    A declaration that Defendants have committed the violations of law alleged in this action;

   b.    Actual damages;

   c.    Statutory damages;

   d.    Exemplary and punitive damages;

   e.    Reasonable attorney's fees and costs;

   f.    Prejudgment and post judgment interest as allowed by law;

   g.    All other relief, in law and in equity, both special and general, to which Plaintiff may be justly entitled.

Dated: Brooklyn, New York
        January 5, 2026

                        Respectfully submitted,

                            */s/ Ahmad Keshavarz*

                        Ahmad Keshavarz
                        The Law Office of Ahmad Keshavarz
                        16 Court St., 26th Floor
                        Brooklyn, NY 11241-1026
                        Phone: (718) 522-7900
                        Fax:    (877) 496-7809

Email: ahmad@NewYorkConsumerAttorney.com

All counsel (VIA ECF)